## Com. ex rel. Jones v. King, Secretary of Commonwealth.

*Nomination of candidates — Petition — Signatures — Uniform Primaries Acts of July 12, 1913, and July 9, 1919—Constitutionality of.*

1. The power to regulate elections is vested in the legislature and cannot be reviewed except for plain, palpable and clear abuse of that power. Errors of judgment, unwise policies or regulations furnish no ground for declaring a statute void.

2. The requirement of the Uniform Primaries Act of July 12, 1913, P. L. 719, as amended by the Act of July 9, 1919, P. L. 839, that nominating petitions of candidates for the office of member of the State House of Representatives shall be signed by at least 100 qualified electors, does not violate article i, section 5, or article viii, section 7 of the Constitution in regard to elections.

3. The 14th Amendment does not apply to a state statute, in so far as it regulates the election of a state officer.

Mandamus.   C. P. Dauphin Co., Commonwealth Docket, 1924, No. 30.

*Charlotte F. Jones,* for plaintiff.

*George W. Woodruff,* Attorney-General, and *James O. Campbell,* Deputy Attorney-General, for respondent.

HARGEST, P. J., March 28, 1924.—Charlotte F. Jones, the relator, asks that a writ of mandamus issue, directing the Secretary of the Commonwealth to accept and file the nominating petition purporting to nominate the relator for the office of Representative in the General Assembly of Pennsylvania as a candidate of the Socialist Party of Chester County. The said petition was signed by twelve voters and members of said party. The Secretary of the Commonwealth refused to accept the same, as shown by the return and answer to said alternative writ of mandamus, because the said petition did not contain the signature of one hundred qualified electors, as required under paragraph *(d)* of section 7 of the Act of Assembly approved July 12, 1913, P. L. 719, as last amended by the Act of July 9, 1919, P. L. 839. The relator demurred to the answer.

The relator contends that the act of assembly which requires the signatures of at least one hundred qualified electors to a petition nominating a person "for the office of a member of the State House of Representatives" is uncon-

516          DISTRICT AND COUNTY REPORTS.          [5 D. & C.]

Com. ex rel. Jones *v.* King, Secretary of Commonwealth.

stitutional, in that it violates the 14th Amendment to the Constitution of the United States, and article I, sections 1, 5 and 22; article VIII, section 7, of the Constitution of Pennsylvania.

In passing upon the constitutionality of a statute, it is to be construed in every possible way to sustain it, and every possible presumption is to be indulged in its favor: Mugle *v.* Kansas, 123 U. S. 623; Sinking Fund Cases, 99 U. S. 700, 718.

Only when a statute violates the Constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in the mind of the court, is it to be declared unconstitutional: Sharpless *v.* Philadelphia, 21 Pa. 147; Railroad Co. *v.* Riblet, 66 Pa. 164; Com. *v.* McWilliams, 11 Pa. 61; Com. *v.* Moir, 199 Pa. 534.

The 14th Amendment to the Constitution of the United States, so far as it can be applied to this case, provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States, nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws."

The privileges and immunities protected by this clause are such as arise out of the nature and essential character of the National Government, and such as are granted or secured by the Constitution of the United States: Ex parte Kemmler, 136 U. S. 436; Giozza *v.* Tiernan, 148 U. S. 657; In re Quarles, 158 U. S. 532; Orr *v.* Gilman, 183 U. S. 278.

The right of suffrage was not necessarily one of the privileges or immunities of citizenship prior to the adoption of the 14th Amendment.

In McPherson *v.* Blacker, 146 U. S. 1, 39, it is said: "The 1st section of the 14th Amendment does not refer to the exercise of the elective franchise. . . . The object of the 14th Amendment in respect of citizenship was to preserve equality of rights and to prevent discrimination as between citizens, but not to radically change the whole theory of the relations of the state and Federal governments to each other, and of both governments to the people."

We do not think that the 14th Amendment applies to a state statute, in so far as it regulates the election of a state officer. No Federal question is therein involved, and, therefore, further discussion, so far as the Federal Constitution is concerned, is unnecessary.

The right to be a candidate or the right to maintain a political party is not among those "inherent and indefeasible rights" in section 1 of article I of the Constitution of Pennsylvania, referring to suffrage or elections, and there is nothing in section 22 of article I referring to suffrage or elections. So far, therefore, as these sections are concerned, no further discussion is necessary.

Section 1 of the Uniform Primaries Act, approved July 12, 1913, P. L. 719, as amended by the Act of May 18, 1917, P. L. 244, provides that candidates for all elective state, county, city and borough offices shall be nominated at primaries held in accordance with the provisions of this act.

Section 2 of the act provides a method for ascertaining whether or not a party or body of electors is a political party within this State, and also provides that such political party "shall nominate all its candidates for any offices provided for in this act" in accordance with the provisions of this act.

Section 5 provides for the printing of official primary ballots, specifies the form of the ballot, and directs that instructions shall be printed thereon permitting a voter to write or paste the names of any person for whom the voter desires to vote in the space provided for that purpose.

Section 6 provides for the printing of the names of all party candidates who have filed nominating petitions upon the ballots of their party.

Section 7, as amended by the Act of July 9, 1919, P. L. 839, provides that nomination petitions of candidates for the office of a member of the State House of Representatives shall be signed by at least one hundred qualified electors.

Section 8 provides that nomination petitions having less than a sufficient number of genuine signatures of qualified electors shall be refused, and section 9 requires the Secretary of the Commonwealth to forward a correct list of candidates of each party to the county commissioners of each county.

It is contended that this act of assembly violates section 5 of article I of the Constitution of Pennsylvania, which provides that "elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage;" also, that it offends against section 7 of article VIII, which provides that "all laws regulating the holding of elections by the citizens or for the registration of electors shall be uniform throughout the State," etc.

In order to violate any one of these constitutional provisions, it must be found that the law does not permit an equal election, the free exercise of the right of suffrage, or does not permit the uniform holding of elections throughout the State. We think the complete answer to every attack in this regard is found in the cases of Patterson v. Barlow, 60 Pa. 54; De Walt v. Bartley, 146 Pa. 529; Winston v. Moore, 244 Pa. 447; Cadwallader v. Secretary of the Commonwealth, 16 Dauphin Co. Reps. 216; Ross v. Secretary of the Commonwealth, 16 Dauphin Co. Reps. 224; Oughton v. Black, 212 Pa. 1.

From these authorities it is clear that the power to regulate elections is vested in the legislature and cannot be reviewed except for a plain, palpable and clear abuse of that power. Errors of judgment, unwise policies or regulations furnish no ground for declaring a statute void.

The only constitutional mandate is that the elections shall be free and equal; that the free exercise of the right of suffrage shall not be prevented, and that laws regulating the holding of election shall be uniform. There is no requirement of the Constitution that the regulations to make "elections free and equal" shall be uniform: Patterson v. Barlow, 60 Pa. 54. The requirement as to uniformity is that the laws regulating the holding of elections shall be uniform. What the Constitution means in the provision that "elections shall be free and equal" is fully answered in Patterson v. Barlow, 60 Pa. 54, 75: "But to whom are the elections free? They are free only to the qualified electors of the Commonwealth. Clearly they are not free to the unqualified. . . . How shall elections be made equal? Clearly by laws which shall arrange all the qualified electors into suitable districts, and make their votes equally potent in the election, so that some shall not have more votes than others, and that all shall have an equal share in filling the offices of the Commonwealth. But how shall this freedom and equality be secured? The Constitution has given no rule and furnished no guide. It has not said that the regulations to effect this shall be uniform. It has simply enjoined the duty and left the means of accomplishment to the legislature. The discretion, therefore, belongs to the general assembly, is a sound one, and cannot be reviewed by any other department of the government except in a case of plain, palpable and clear abuse of the power which actually infringes the rights of the electors."

Speaking of the freedom and equality of electors, it is said in De Walt v. Bartley, 146 Pa. 529, 540: "This means that every citizen shall have an equal right to cast a free ballot."

In Winston v. Moore, 244 Pa. 447, it is said: "In a general way, it can be said that elections are free and equal within the meaning of the Constitution when they are public and open to all qualified electors alike; when every voter has the same right as any other voter; when each voter, under the law, has the right to cast his ballot and have it honestly counted; when the regulation of the right to exercise the franchise does not deny the franchise itself or make it so difficult as to amount to a denial; and when no constitutional right of the qualified elector is subverted or denied him."

Applying these principles, what is there in this act of assembly which prevents elections from being free and equal or which interferes with the free exercise of the right of suffrage? Every voter is treated alike. Every voter has the same right as any other voter, and every voter has the right to cast his ballot and have it counted. The regulations in this act of assembly do not deny the right of franchise, and, moreover, the regulations in this act of assembly refer only to nominations.

In Winston v. Moore, 244 Pa. 447, 456, it is said: "The Constitution says nothing about nominations, or how candidates shall be chosen, or how many names shall be printed on the ballot. It furnishes no rule by which to accurately determine what the legislature may or may not do in the enactment of laws relating to such details in the exercise of the elective franchise. In the absence of any express constitutional limitation upon the power of the legislature to make laws regulating elections and providing for an official ballot, nothing short of gross abuse would justify a court in striking down an election law demanded by the people and passed by the law-making branch of the government in the exercise of a power always recognized and frequently asserted."

The test as to the constitutionality of such legislation is whether it denies the franchise or renders its exercise so difficult and inconvenient as to amount to a denial. To require the voter, under certain circumstances, to write the name of the person whom he desires to vote for is not such a denial: Winston v. Moore, 244 Pa. 447; De Walt v. Bartley, 146 Pa. 529-540. In the case last cited the constitutionality of the Election Law of 1891 was before the court. The 2nd section of this act provided that nominations of candidates to appear on the official ballots could only be made by certificates of the officers of the authorized nominating body of a political party which had polled 3 per cent. of the largest vote cast for any office in the State at the preceding election or by papers signed by qualified electors to the number of one-half of 1 per cent. of the largest vote cast at the preceding election for any officer for the State at large, if the nomination is for the State at large, otherwise to the number of 3 per cent. of the largest vote cast at the preceding election for any officer elected in that portion of the State for which the nomination is made. Precisely the same attack was made upon that statute that is now made upon this.

It was urged there that the statute conferred upon the voters of some political parties favors and immunities that were then denied to the Prohibition Party, because it did not have the sufficient number to nominate by a party convention and that it was a discrimination against the Prohibition Party, a violation of the free and equal clause of the Constitution and also of the provision that the laws regulating the holding of elections shall be uniform. Of this contention the Supreme Court said, page 543: "This contention is plausible, but unsound. The act does not deny to any voter the exercise of the elective franchise because he happens to be a member of a party which at the last general election polled less than 3 per cent. of the entire vote cast. The provision referred to is but a regulation, and we think a rea-

sonable one, in regard to the printing of tickets. The use of official ballots renders it absolutely necessary to make some regulations in regard to nominations, in order to ascertain what names shall be printed on the ballot. The right to vote can only be exercised by the individual voter. The right to nominate, flowing necessarily from the right to vote, can only be exercised by a number of voters acting together. Three persons may claim to be a political party, just as the three tailors of Tooley Street assumed to be 'the people of England.' It follows, if an official ballot is to be used, nominations must be regulated in some way, otherwise the scheme would be impracticable and the official ballot become the size of a blanket. While so regulating it, the act carefully preserves the right of every citizen to vote for any candidate whose name is not on the official ballot, and this is done in a manner which does not impose any unnecessary inconvenience upon the voter."

We see no difference in principle between the case just cited and the case at bar. If the legislature may say that no political organization can acquire the legal dignity of a party unless it has polled 3 per centum of the largest vote cast at the preceding election, and that no number of electors less than one-half of 1 per centum of the largest vote cast at the preceding election can file a nomination petition for an officer to be elected for the State at large, and if, for a sub-division of the State, a nominating petition must be signed by 3 per centum of the largest vote cast at the preceding election for any officer elected in that district, why, then, could not the legislature also say that no one shall be placed upon the official ballot who does not file a petition signed by one hundred qualified electors?

In Oughton *v.* Black, 212 Pa. 1, the statutory provision, which permitted a voter to cast a straight party vote by placing a single mark in the square opposite the party designation, was attacked on the ground that that statute violated the "free and equal" provision of the Constitution, in that it made it easy for the elector who voted the straight ticket to prepare his ballot and to mark it more quickly than one who does not so vote. The Supreme Court held that this did not in any way interfere with the freedom and equality of elections within the meaning of the Constitution.

The Act of July 24, 1913, P. L. 1001, which provided for the election of judges by a non-partisan ballot, was attacked as violating both the "free and equal" and the "uniformity" clauses of the Constitution relating to elections. That act prevented political parties from making nominations for the office of judge, and it provided that candidates for that one single office were to be voted for in a manner different from the other candidates. The court held that there was no constitutional requirement for party nomination, and, the organic law being silent on the subject, the legislature necessarily had a very wide discretion, and that the act of assembly did not in any way violate the Constitution: Winston *v.* Moore, 244 Pa. 447.

In the very illuminating opinion of Mr. Justice Elkin in Winston *v.* Moore, 244 Pa. 447, discussing the broad powers of the legislature with reference to the regulations of elections, he said, page 455: "Indeed, so far as we are now advised, no act dealing solely with the details of election matters has ever been declared unconstitutional by this court. This for the reason that ballot and election laws have always been regarded as peculiarly within the province of the legislative branch of government, and should never be stricken down by the courts unless in plain violation of the fundamental law."

In this case, also, the provision authorizing a candidate who receives more than 50 per cent. of the votes cast at the primary election to become a sole candidate to be placed upon the ballot at the general election is sustained:

Cadwallader v. Secretary of the Commonwealth, 16 Dauphin Co. Reps. 216; Ross v. Secretary of the Commonwealth, 16 Dauphin Co. Reps. 224.

It is so clear that the act of assembly before us, relating to nominations, operates upon all sections of the State, all political parties, all candidates, alike that it is not necessary to discuss the contention that it is a local or special law for conducting elections, in violation of article III, section 7, of the Constitution. Nor is it necessary to go outside of the State and discuss the authorities of other states cited by the relator, such as Britton v. Board of Election Commissioners, 51 L. R. A. 115, 61 Pac. Repr. 1115, which are diametrically opposed to the decisions in our own State.

For the reasons we have given, we see no violation of the Constitution of Pennsylvania in the requirement of our Uniform Primaries Act that the nominating petitions of candidates for the office of member of the State House of Representatives shall be signed by at least one hundred qualified electors.

Now, March 28, 1924, the alternative writ of mandamus is dismissed, at the cost of the relator.          From George R. Barnett, Harrisburg, Pa.